<u>FOR PUBLICATION</u>

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 2014-31 |
| | ) | |
| JAHMAL A. RIVERA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<small>ATTORNEYS:</small>

**Ishmael Meyers, AUSA**
**Ronald Sharpe, USA**
St. Thomas, VI
    *For the United States of America,*

**Martial Webster, Sr.,**
St. Croix, VI
    *For Jahmal A. Rivera.*


<u>MEMORANDUM OPINION</u>

**GÓMEZ, J.**

        Before the Court is defendant Jahmal A. Rivera's motion to suppress.  The central question presented by the motion is whether a post-flight checkpoint erected at the St. Thomas airport to screen only passengers arriving from St. Croix for guns and drugs, absent a warrant or individualized suspicion, was permissible under the Fourth Amendment.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 2

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

On April 29, 2014, Jahmal Rivera (defendant or "Rivera")
boarded a nonstop commuter flight from St. Croix to St. Thomas.
Prior to boarding, in accordance with airline policy, Rivera
checked a bag at plane side.  The bag was stored in the luggage
compartment underneath the aircraft.  After the aircraft landed
at the St. Thomas airport, Rivera retrieved his bag at plane
side and proceeded toward the airport exit.  On his way to the
exit, but while still on the airport ramp,[1] Rivera and the other
arriving St. Croix passengers were stopped by Customs and Board
Protection ("CBP") agents and local police.  The CBP agents
announced that they would be inspecting the bags of all
passengers arriving from St. Croix. Transcript of July 17, 2014
Hearing ("Tr.") at 11, 29-31.

CBP agents told Rivera and the other arriving passengers to
place their bags through a mobile X-ray machine, housed in a

---

[1]      Because there are no jet bridges at the St. Thomas airport, all
arriving passengers must travel along the airport ramp in order to reach the
airport exit. *See* Opposition to Motion to Suppress at 5 ("The Cyril E. King
Airport does not have jet bridges that attach to the aircraft.  Passengers at
the airport use stairs to deplane and walk on the tarmac until they enter the
building.") [ECF No. 38].

     Although the parties at times refer to the area where passengers are
loaded and unloaded from an airplane as the "tarmac," the correct terminology
is "apron" or "ramp."  The Federal Aviation Administration ("FAA") defines
the "apron(ramp)" as "a defined area on an airport intended to accommodate
aircraft for purposes of loading or unloading passengers or cargo, refueling,

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 3

van, which had been set up as a temporary "baggage screening checkpoint."  Opposition to Motion to Suppress ("Opposition") at 2. [ECF No. 38]; Tr. at 11, 27, 29-31. This checkpoint was erected on the periphery of the airport ramp, on the path taken by arriving passengers on their way to the airport exit.  There was testimony that Rivera attempted to go around the checkpoint, but he was stopped by supervising CBP agent Ralph Dasant and told that "all bags have to be checked."[2]  Tr. at 32.

An X-ray scan of Rivera's bag revealed what appeared to be a loaded firearm.  Tr. at 13.  CBP agent Dasant immediately detained Rivera at that point by placing him up against a wall.  Fellow CBP agent Latisha Etienne then physically searched

---

parking or maintenance." FAA Advisory Circular No. 120-57A, *Surface Movement Guidance and Control System*, at ¶ 5(a) (Dec. 19, 1996), available at http://www.faa.gov/documentLibrary/media/Advisory_Circular/AC%20120-57A.pdf. The term "tarmac" refers to a type of road surface used to pave the parking area or runway of some airports. It is also commonly used to refer either to the runway itself or the airport taxilanes leading to or away from the runway. *See, e.g.,* Department of Transportation Final Rule, *Enhancing Airline Passenger Protection*, 74 Fed. Reg. 68983-01 (Dec. 30, 2009) (referring to "tarmac" delays as problem consumers face when aircraft sit for hours on the airport tarmac before being cleared for takeoff or after landing but before parking at the gate).  While passengers routinely have access to the airport "ramp," ordinarily, they do not have access to the airport "tarmac."

[2]    CBP agent Ralph Dasant testified that the search included checked luggage, carry-on bags, and personal items such as purses.  CBP agents also conducted a canine sniff of bags and luggage in an effort to detect illegal narcotics.  Tr. at 98.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 4

Rivera's bag.[3] That search uncovered a loaded handgun.  Tr. at 34.  Rivera was arrested and charged with carrying a loaded firearm on an aircraft in violation of 49 U.S.C. § 46505(b)(2).

On June 23, 2014, Rivera moved to suppress evidence of the loaded firearm as the product of an unlawful search and seizure. The Government countered that the "baggage screening checkpoint" was a permissible administrative search.[4]  It acknowledged that the checkpoint was established to "address the threat of gun violence during Carnival"[5] but insisted that the search also

---

[3]     There was conflicting testimony as to whether Rivera consented to a physical search of his bag once the X-ray scan revealed the loaded firearm. Agent Dasant testified that Rivera consented.  Tr. at 33.  Rivera claimed that he never gave permission to open his bag.  *Id*. at 44.

[4]     The Government thus conceded that the search of Rivera's bag was not a routine border search. *See also* Tr. 56-57.  Although Congress has erected a border between the Virgin Islands and the "rest of the United States," *United States v. Hyde*, 37 F.3d 116, 122 (3d Cir. 1994), it has not erected one between St. Croix and St. Thomas.  Absent Congressional action, the Territory of the Virgin Islands is without power to create one. *See, e.g., Torres v. Puerto Rico*, 442 U.S. 465, 472-73 (1976).

[5]     The Government explained its rationale for the checkpoint as follows:

> Gun violence has plagued the St. Thomas Carnival season for many years.  Federal and territorial law enforcement agencies have long recognized this threat and the fact that firearms are smuggled into St. Thomas during that time period.  During [C]arnival thousands of people flock to St. Thomas by commercial airline to participate in various events . . . . To address the threat of gun violence during Carnival, federal and territorial agencies established a baggage screening checkpoint at the St. Thomas airport and the Seaplane terminal in St. Thomas at various times during carnival week.

Opposition at 1 [ECF No. 38]. St. Thomas Carnival is an annual, month-long, cultural celebration that includes a variety of festivities, including

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 5

served to protect personnel and aircraft on the airport ramp, which is a secure area. Alternatively, the Government argued that Rivera "impliedly consented to the search when he decided to fly from St. Croix to St. Thomas." *Id.* at 6.

At the July 17, 2014 evidentiary hearing, the CBP agents who conducted the search of Rivera's bag both testified that the purpose of the search was to interdict the flow of guns and drugs into St. Thomas during Carnival. Tr. at 10, 22, 29 (search done because of movement of weapons and drugs between the islands). The Government reinforced this position at closing. *Id.* at 58 ("[T]he compelling reason was Carnival and the influx of drugs and guns and the escalation of violence during Carnival. That's why this particular search was done.").

Agent Dasant testified that the baggage screening checkpoint was in operation at the St. Thomas airport only on the day Riviera was searched, only between the hours of 7:30 a.m. to 5:00 p.m., and only for passengers arriving on commuter flights from St. Croix. Tr. at 28, 96-97.[6]   Passengers arriving

---

parades, food fairs, beauty pageants, horse and boat races, concerts, and shows. In 2014, St. Thomas Carnival lasted from April 5 to May 3.

[6]    The Government also established a checkpoint at the seaplane terminal on the St. Thomas waterfront to screen the bags of passengers arriving from St. Croix during Carnival. The checkpoint at the seaplane terminal was in effect for two days. Tr. at 96. There was also evidence that the checkpoint

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 6

at the St. Thomas airport that day by commercial jet from the

continental United States were not subject to search, nor were

passengers arriving from St. Croix after 5:00 p.m.  *Id*. at 87-

88.  Agent Dasant also testified that he had no reason to

suspect that Rivera's bag contained a firearm, until he was

alerted by the results of the X-ray scan.  *Id*. at 28, 32.[7]

### DISCUSSION

The Fourth Amendment provides:

> The right of the people to be secure in their
> persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon
> probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and
> the person or thing to be seized.

---

was erected previously for the St. John Carnival and perhaps for the Carnival
in St. Croix. Tr. at 10, 28.  It is unclear whether passengers arriving from
Puerto Rico and the British Virgin Islands also were screened.  Of course,
because those passengers crossed a border when they arrived in St. Thomas,
the border search exception would apply to any routine search of their
luggage.  *See United States v. Chabot*, 531 F. Supp. 1063, 1069 (D.V.I. 1982)
(border search exception applies to persons entering Virgin Islands from
Puerto Rico).

[7]     This case is thus distinguishable from those cases where law
enforcement, acting on a tip, conduct a post-flight search of an arriving
passenger. *See, e.g., United States v. Rowland*, 464 F.3d 899, 909 (9th Cir.
2006) (upholding search of passenger arriving in Guam from Hawaii based on
informant's tip that he would be importing drugs).  Under certain
circumstances, a tip that a particular passenger may be carrying drugs or
guns may satisfy the Fourth Amendment's individualized suspicion requirement.
*Id*. at 909 & n.4 (declining to address border search issue, since Guam custom
officers had reasonable suspicion to search).

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 7

U.S. CONST. AMEND. IV.[8]  "A search or seizure is ordinarily
unreasonable in the absence of individualized suspicion of
wrongdoing.  While such suspicion is not an 'irreducible'
component of reasonableness, [the Supreme Court has] recognized
only limited circumstances in which the usual rule does not
apply."  *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000);
*United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir.), *cert.
denied*, 549 U.S. 945 (2006).

Two of those "limited exceptions" are "special-needs and
administrative search cases, where 'actual motivations' do
matter."  *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074,
2080-81 (2011) (emphasis added) (quoting *United States v.
Knights*, 534 U.S. 112, 122 (1995)). "A judicial warrant and
probable cause are not needed where the search or seizure is
justified by special needs *beyond the normal need for law
enforcement*."  *Al-Kidd*, 131 S.Ct. at 2081 (emphasis added)
(internal quotation marks and citations omitted); *Chandler v.
Miller*, 520 U.S. 305, 313-14 (1997) (same).

---

[8]    Congress extended the "first to ninth amendments inclusive" to the
Constitution of the United States to the Virgin Islands "to the extent they
have the same force and effect there as in the United States or in any state
of the United States." 48 U.S.C. § 1561.  It also extended the "second
sentence of section 1 of the fourteenth amendment."  *Id.*

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 8

In administrative search cases, the motive or purpose
behind the search is of critical importance. *Edmond*, 531 U.S. at
40 ("[W]hat principally distinguishes [unlawful] checkpoints
from those we have previously approved is their primary
purpose."); *Al-Kidd*, 131 S.Ct. at 2080 (in administrative search
cases "actual motivations do matter").  Where the primary
purpose of a checkpoint search is to ensure the safety or
efficiency of a regulated activity, the administrative search
exception applies, and the search is permissible even without a
warrant or individualized suspicion.  *Al-Kidd,* 131 S.Ct. at
2081.

Where the checkpoint search is intended to detect ordinary
criminal wrongdoing, however, the administrative search
exception does not apply. *Edmond*, 531 U.S. at 41; *Al-Kidd,* 131
S.Ct. at 2081 ("[The] exception [does] not apply where the
officer's purpose is not to attend to the special needs or to
the investigation for which the administrative inspection is
justified.").  Checkpoint searches that are designed "primarily
to serve the general interest in crime control" require a
warrant or probable cause. *Edmond*, 531 U.S. at 42.  *Whren v.
United States*, 517 U.S. 806, 811-12 (1996) ("[T]he exemption
from the need for probable cause (and warrant), which is
accorded to searches made for the purpose of inventory or

administrative regulation, is not accorded to searches that are *not* made for those purposes.") (emphasis in original).  On this point, the Supreme Court was emphatic:  "We have *never* approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41 (emphasis added).

This rule applies in the context of airport checkpoints as well.  Pre-boarding security screenings at an airport are generally "permissible administrative search[es] under the Fourth Amendment, even though [they are] initiated without individualized suspicion and [are] conducted without a warrant." *George v. Rehiel*, 738 F.3d 562, 577 (3d Cir. 2013); *Hartwell*, 436 F.3d at 178. "[S]creening passengers at an airport is an administrative search because the primary purpose is not to determine whether any passenger has committed a crime but rather to protect the public from a terrorist attack."  *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 10 (D.C. Cir. 2011); *see Hartwell*, 436 F.3d at 179-80 (airport checkpoints serve compelling Government interest of "prevent[ing] terrorist attacks on airplanes"); *accord United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (*en banc*).

Airport checkpoints remain subject to the Fourth Amendment, however.  *Rehiel*, 738 F.3d at 562 (detention at airport

checkpoint at hands of TSA was "at the outer boundary of the Fourth Amendment"); *see Hartwell*, 436 F.3d at 180 n.10.  A particular airport screening search is constitutionally reasonable only where it is no more extensive nor intensive than necessary to ensure the safety of air travel. *See Aukai*, 497 F.3d at 962.  "In other words, an airport search remains a valid administrative search only so long as the scope of the administrative search exception is not exceeded; once a search is conducted for a criminal investigatory purpose, it can no longer be justified under the administrative search rationale." *United States v. McCarthy*, 648 F.3d 820, 831 (9th Cir. 2011) (internal quotations and citations omitted).

## ANALYSIS

The Court's Fourth Amendment analysis proceeds in three stages.  "First [the Court] ask[s] whether a Fourth Amendment event, such as a search or seizure has occurred.  Next, [it] consider[s] whether that search or seizure was reasonable.  If it was not, [the Court] then determine[s] whether the circumstances warrant suppression of the evidence."  *United States v. Dupree*, 617 F.3d 724, 730 (3d Cir. 2010) (citation omitted).

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 11

### I. **Application of the Fourth Amendment to the Stop and Search of Rivera**

"The first step in Fourth Amendment analysis is to identify whether a search or seizure has taken place." *Hartwell*, 436 F.3d at 177. The Government concedes that the initial X-ray scan of Rivera's bag constituted a search for Fourth Amendment purposes.[9]

Stopping Rivera at the "baggage screening checkpoint" and preventing him from leaving the airport also constituted a seizure of his person within the meaning of the Fourth Amendment. *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("The Fourth Amendment applies to seizures of the person, including brief investigatory stops."); *see Edmonds*, 531 U.S. at 40 ("It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment."); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450 (1990) ("[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint."); *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995) (Fourth Amendment

---

[9]    Supplemental Opposition to Motion to Suppress at 2 ("Supplemental Opposition") [ECF No. 44]. *See United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir. 1980); *United States v. Haynie*, 637 F.2d 227, 230 (4th Cir. 1980) (examination of closed container by means of X-ray scanner constitutes Fourth Amendment search).

seizure occurred while defendant questioned by law enforcement
at baggage claim area).

Since the CBP agents lacked a warrant or any reason to
suspect Rivera, stopping him and searching his bag was
unreasonable unless it fell within one of the exceptions to the
Fourth Amendment. *See Hartwell*, 436 F.3d at 178.

## II.  The Reasonableness of the Search

The Government argues that the stop and search of Rivera
falls within the administrative search exception to the Fourth
Amendment.  In support of its argument the Government relies on
*United States v. Hartwell*, 436 F.3d 174 (3d Cir. 2006).  The
Government's argument is problematic for several reasons.

### A. *Hartwell*'s Application to Rivera's Search and Seizure

To appreciate *Hartwell*'s effect, a brief overview of that
case is required.  In *United States v. Hartwell*, Transportation
Security Administration ("TSA") agents screened Christian
Hartwell at a routine, pre-boarding checkpoint at the
Philadelphia International Airport as he attempted to board a
flight to Phoenix.  The X-ray search of his hand luggage took
place without incident.  His fortune changed after that,
however, as he set off the magnetometer as he walked through.
That led to a follow-up search with a handheld, wand-like

magnetometer.  The wand revealed a solid object in the

defendant's pants, which turned out to be illegal narcotics.

*Hartwell*, 436 F.3d at 175-76.

Hartwell was arrested and charged in a two-count indictment

with possession with intent to distribute cocaine and cocaine

base, in violation of 21 U.S.C. § 841.  *United States v.

Hartwell*, 296 F. Supp. 596, 599 (E.D. Pa. 2003), *aff'd*, 436 F.3d

174, 178 (3d Cir.), *cert. denied*, 549 U.S. 945 (2006).  He filed

a motion to suppress physical evidence obtained from the search

at the TSA checkpoint and certain statements made later to the

police.  The trial court denied Hartwell's motion to suppress

the physical evidence but granted his motion to suppress his

statements to the police.  *Hartwell*, 296 F. Supp.2d at 604-05,

609.

The U.S. Court of Appeals for the Third Circuit found that

the search at the airport checkpoint fell within the

administrative search doctrine because it was narrowly tailored

to prevent terrorist attacks or hijackings on airplanes while

minimally intruding on the defendant's personal privacy.

*Hartwell*, 436 F.3d at 181. In reaching that conclusion, the

Third Circuit analyzed the airport checkpoint under a three-part

test outlined by the U.S. Supreme Court in *Brown v. Texas*, 443

U.S. 47 (1979):

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 14

> Suspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."

436 F.3d at 178 (quoting *Brown*, 443 U.S. at 51) (internal citations omitted).

The *Hartwell* court found that the airport checkpoint met the first prong of the *Brown* test, because "preventing terrorist attacks on airplanes is of paramount importance." *Hartwell*, 436 F.3d at 179. The pre-boarding checkpoint also passed the second prong because "absent a search, there is no effective means of detecting which airline passengers are reasonably likely to hijack an airplane." *Id*. at 179-80 (quoting *Singleton v. Comm'r of Internal Revenue,* 606 F.2d 50, 52 (3d Cir. 1979)). Finally, it found that scanning the defendant's carry-on bag and having him pass through a magnetometer at the airport checkpoint was minimally intrusive and did not violate his personal privacy. *Hartwell*, 436 F.3d at 180.

The Government has misread *Hartwell* by overlooking the critical importance of motive in administrative search cases. Indeed, in *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000), the Supreme Court, in finding a narcotics checkpoint to be impermissible, instructed that "what principally

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 15

distinguishes [unlawful] checkpoints from those we have previously approved is their primary purpose." *See also Al-Kidd*, 131 S.Ct. at 2080 (in administrative search cases "actual motivations do matter"). *Hartwell* must be read in conjunction with *Edmond*. If not, *the Brown* test employed in *Hartwell* could be used to justify any ordinary law enforcement checkpoint, even the narcotics checkpoint found impermissible in *Edmond*. Rather, in determining whether a warrantless, suspicionless checkpoint is permissible, a court "must consider the *nature of the interests threatened* and their connection to the particular law enforcement practices at issue." *Edmond*, 531 U.S. at 42-43 (emphasis added).

*Hartwell* makes clear that the nature of the interests threatened in that case was air travel safety. Underpinning the holding in *Hartwell* was the obvious fact that the pre-boarding airport screening at the Philadelphia airport was part of a national regulatory scheme, authorized by statute, to protect the flying public from the threat of "terrorist attacks on airplanes." *Hartwell*, 436 F.3d at 179. This was the overarching motive for the screening of the defendant in that case. The pre-boarding search was "permissible under the administrative search doctrine because the State has an overwhelming interest in *preserving air travel safety*, and the

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 16

procedure is tailored to advance that interest while proving to

be only minimally invasive. . . ." *Hartwell*, 436 F.3d at 180

(emphasis added).

Here, the nature of the interests protected by the "baggage

screening checkpoint" is that of general crime control.

Interdicting the flow of guns and drugs into St. Thomas during

Carnival serves a very compelling government interest, to be

sure, but it has nothing to do with preventing terrorist attacks

on airplanes. Viewed through the prism of *Edmonds* and the

purpose-driven inquiry it requires, the "baggage screening

checkpoint" does not meet the three-pronged test in *Hartwell*

because the nature of the threat protected has little to do with

air travel safety.

Indeed, the airport checkpoint found permissible in

*Hartwell* is so unlike the "baggage screening checkpoint" in this

case that *Hartwell* actually lends support to the motion to

suppress.  To begin, the primary purpose of the pre-boarding

checkpoint in *Hartwell* was to "prevent terrorist attacks on

airplanes."  *Hartwell*, 436 F.3d at 180. The primary purpose of

the "baggage screening checkpoint" here was to "address the

threat of gun violence during Carnival." Opposition at 1 [ECF

No. 38]. The TSA checkpoint in *Hartwell* was authorized by

federal statute and implemented by regulations.  49 U.S.C. §

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 17

44901; 49 C.F.R. 1540.111(c).  There is no statutory or
regulatory authority for the "baggage screening checkpoint" in
this case.[10]

Significantly, the checkpoint screening in *Hartwell* took
place before passengers boarded the aircraft, when the risk of
smuggling weapons or explosives on board was highest.  *Hartwell*,
436 F.3d at 180 (citing *United States v. Marquez*, 410 F.3d 612,
618 (9th Cir. 2005) ("It is hard to overestimate the need to
search air travelers for weapons and explosives *before* they are
allowed to board the aircraft.") (emphasis added). The post-
flight checkpoint screening in this case took place when the
risk of air terrorism had all but dissipated. The flight was
completed. Rivera had deplaned and retrieved his luggage, and he
was on his way to the airport exit.

In *Hartwell*, the pre-boarding screening was conducted at a
fixed airport checkpoint by TSA agents who are charged with

---

[10]     In *Hyde* and other airport checkpoint cases arising out of this
district, the Government relied on express statutory and regulatory authority
for the pre-boarding search of departing passengers.  *Hyde*, 37 F.3d at 121
(pre-boarding search of passengers leaving the V.I. for the U.S. was lawful
border search) (relying on 19 U.S.C. § 1467 and 19 C.F.R. § 122.144(b));
*United States v. Pollard*, 326 F.3d 397, 401 (3d Cir. 2003) (pre-boarding
immigration check of passengers leaving the V.I. for U.S. was permissible
administrative search) (relying on 8 U.S.C. § 1182(d)(7) and 8 C.F.R. §
235.5).  The Government has provided no similar statutory or regulatory
authority for the search of the baggage of arriving passengers on a nonstop,
intra-Territory flight, though the Court asked repeatedly that it do so.  Tr.
at 47-49.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 18

ensuring the safety of air travel. 49 U.S.C. § 44901. Such

routine pre-boarding screenings by TSA agents do not require a

warrant or probable cause. *Hartwell,* 436 F.3d at 180.  Here,

Rivera's bag was screened at a mobile checkpoint, established

for one day only,[11] and operated by CBP agents and local police.

CBP agents are charged with searching for illegal

contraband on "persons, baggage, and merchandise arriving in the

Customs territory of the United States from places outside

thereof."  19 C.F.R. § 162.6.  Ordinarily, CBP agents must have

probable cause to conduct a search at a point other than the

border or the functional equivalent thereof.  *Almeida-Sanchez v.*

*United States*, 413 U.S. 266 (1973); *United States v. Brennan*,

538 F.2d 711, 716 (11th Cir. 1976). The Government admits that

there is no border, nor the functional equivalent of a border,

between St. Croix and St. Thomas.

The TSA checkpoint in *Hartwell* was found to be minimally

intrusive because the defendant was on notice that he would be

---

[11]    The regularity of a checkpoint, such as whether it is fixed and
permanent, as opposed to mobile and roving, is important in checkpoint cases.
*United States v. Martinez-Fuerte*, 428 U.S. 543, 559 (1976) ("The regularized
nature in which established checkpoints are operated is visible evidence,
reassuring to law-abiding motorists, that the stops are duly authorized and
believed to serve the public interest."); *Delaware v. Prouse*, 440 U.S. 648,
661-63 (1979) (invalidating roving, discretionary, checkpoint for driver's
license and registration because police officer exercised "standardless and
unrestrained discretion").

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 19

searched "before he could board a plane." *Hartwell*, 436 F.3d at

181.  In this case, it is clear that Rivera was on notice that

he would be searched before he boarded the airplane, but he was

not on notice – nor could he be – that he would be searched at

an unannounced, one-day, checkpoint once he landed in St.

Thomas.

Finally, *Hartwell* also found the TSA screening minimally

intrusive because everyone was subject to search, thereby

eliminating any "stigma attached to being subjected to search at

a known, designated airport search point." *Hartwell*, 436 F.3d

at 180-81.  Here, passengers arriving from St. Croix were

stigmatized because the "baggage screening checkpoint" targeted

only them.

This resulted in a questionable legal anomaly.  Passengers

arriving at the St. Thomas airport from St. Croix, who never

crossed a border, were stopped, searched, and subjected to a

canine sniff by CBP agents who had no legal authority to do so.

Yet, passengers arriving from the continental U.S., who CBP

agents could legally search because they actually crossed a

border, were free to go on their way.  *See David v. Government

of Virgin Islands*, 2009 WL 1872678 at *5, 51 V.I.993, 1003

(D.V.I. 2009) ("[A] person who enters the U.S. Virgin Islands

from the continental United States . . . is considered to have

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 20

crossed a border within the meaning of the border search

exception to the warrant requirement."). The only reasonable

inference to be drawn from this set of facts is one that the

Government is not permitted to make:  that passengers arriving

from St. Croix warranted greater suspicion than passengers

arriving from elsewhere.[12]

     Moreover, the Government has cited no authority, and this

Court has found none, applying the administrative search

exception to a post-flight screening of passengers arriving on a

nonstop domestic flight.[13]  On the contrary, those cases

_____

[12]   Since Rivera did not raise it and because it is not necessary to the
resolution of this case, the Court has no occasion to consider whether the
baggage screening checkpoint may have run afoul of the Equal Protection
Clause of the Fifth and Fourteenth Amendments. U.S. CONST. AMEND. V, XIV. S*ee,
e.g., Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002)
(establishing that in the airport screening context, Fourth Amendment and
Equal Protection analyses are distinct inquiries).

[13]   A nonstop flight that originates in the United States and lands in
another United States location is considered a domestic flight, even though
it may have crossed international airspace. *See United States v. Cabaccang*,
332 F.3d 622, 626-27 (9th Cir. 2003) (*en banc*) ("We do not treat passengers
who travel through international airspace on a nonstop flight between two
U.S. locations as having crossed our borders (i.e. as having entered the
United States from a place outside thereof), and thereby subject to
immigration inspections or border searches – as they would be if the flight
had originated in a foreign country."); (*citing United States v. Garcia*, 672
F.2d 1349, 1357-58 (11th Cir. 1982)).  Were this not the case, passengers
traveling from Los Angeles to Honolulu, for example, would be subject to
customs and immigration inspections upon arrival.  The same rationale applies
to passengers traveling from St. Croix to St. Thomas.

     On the other hand, passengers arriving in the United States on a
nonstop flight that originated in a foreign country are subject to routine
border searches at airports, which are considered the "functional equivalent
of a border." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 21

involving a search of the baggage of arriving passengers who did

not cross a border, have relied on a warrant, individualized

suspicion, or the consent of the passenger. *See, e.g., United*

*States v. Place*, 462 U.S. 696, 699 (1983) (DEA agents obtained

warrant to search baggage arriving on flight from Miami to New

York); *United States v. Tyson*, 653 F.3d 192, 196 n.4 (3d Cir.

2011) (ATF agents obtained warrant to search baggage arriving on

flight from Tennessee to St. Thomas) *United States v. Frost*, 999

F.2d 737, 739 (police officers obtained consent to empty pockets

then obtained warrant to search baggage arriving on flight from

Ft. Lauderdale to Philadelphia); *United States v. Bueno*, 21 F.3d

120, 122 (6th Cir. 1994) (defendant arriving on flight from New

York to Cincinnati consented to search of carry-on bag); *United*

*States v. Rowland*, 464 F.3d 899, 909 (9th Cir. 2006) (Guam

customs officials had reasonable suspicion to search luggage of

passengers arriving in Guam on nonstop flight from Honolulu

based on informant's tip).

These important differences between the pre-boarding TSA

screening in *Hartwell* and the post-flight "baggage screening

checkpoint" here, demonstrate that the search of Rivera's bag

did not fall within the administrative search exception.  Quite

simply, there is no statutory or regulatory scheme authorizing a

checkpoint search for guns and drugs of passengers arriving on a

nonstop domestic flight. The "baggage screening checkpoint" could not be in furtherance of a regulatory scheme that does not exist.

### *B.* The Purpose of the Post-Flight "Baggage Screening Checkpoint"

Even though the Government admits that the "baggage screening checkpoint" was primarily intended to interdict the flow of guns and drugs during Carnival, it nevertheless urges that the screening served the lawful secondary purpose of protecting personnel and aircraft on the airport ramp, a secure area. That argument is belied by the non-regularized and selective nature of the checkpoint search, as well as by the character of that search.

The Government's claim that the safety of air travel is advanced by searching the bags of only some passengers after they have completed their flight and are leaving the airport strains logic.[14] It is just as incongruous as claiming that the courtroom is made safe by screening visitors as they leave the

_____

[14]   The statute authorizing the Transportation Security Administration ("TSA") to screen at airports mandates that screening of "all" passengers and baggage "shall take place *before* boarding." 49 U.S.C. § 44901 (emphasis added). The fact that TSA agents, charged with ensuring the safety of the flying public, were not involved in the post-flight "baggage screening checkpoint" weakens the Government's contention that it was intended to promote the safety of air travel.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 23

courthouse building.  A checkpoint that is nonexistent for 364
days of the year, and that screened only some passengers
arriving from St. Croix on its only day in operation, could
hardly be intended to protect personnel and aircraft on an
airport ramp that operates year round.  Moreover, the Government
has not explained how the use of a *drug*-sniffing dog promoted
the "detection and prevention of *firearms* being carried in
secure locations at the airport." Opposition at 5 (emphasis
added).  [ECF No. 38].

    Instead, the available evidence shows that the positioning
of the "baggage screening checkpoint" on the airport ramp was
motivated more by tactical considerations, to ensure that
arriving passengers could not get around it, than by any
interest in protecting aircraft or personnel on the ramp.  CBP
supervising agent Ralph Dasant testified that the checkpoint was
purposely "set up in the area where once the individuals exit
the aircraft there's a doorway that they have to enter to get
off the runway [sic].  We set up the [X-ray] van in that
particular area.  As the folks got off the aircraft I stopped
everyone, and I told them that this morning we'll be doing an
inspection of all bags that is [sic] being brought in." Tr. at
31. The placement of the checkpoint on the airport ramp (between
the arriving aircraft and the doorway to the terminal building)

had more to do with blocking the airport exit than with protecting a secure area of the airport.

In the end, the Government's claim that the "baggage screening checkpoint" served a legitimate secondary purpose fails because it cannot answer the most obvious of questions. If there are no jet bridges at the St. Thomas airport and *all* arriving passengers walk along the periphery of the ramp to exit the airport, how is ramp security advanced by searching only passengers arriving from St. Croix, one day of the year?   Even if the "baggage screening checkpoint" were intended to address ramp security, it fails to meet the *Brown* test because it is neither narrowly tailored to achieve those ends nor minimally intrusive, since it stigmatized passengers arriving from St. Croix.   *Hartwell*, 436 F.3d at 180-81. On this point, at least, the Government's interests and those of the defendant coalesce: both the Government's legitimate interest in promoting air travel safety and the defendant's interest in being free from impermissible government intrusion are far too vital to turn on the happenstance of a passenger's zip code.

### *C.* Implied or Express Consent to Search

The Government argues, in the alternative, that Rivera impliedly consented to the post-flight search of his bag by

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 25

electing to fly from St. Croix to St. Thomas.[15]  It also contends
that he voluntarily consented to the physical search of his bag
once the X-ray scan revealed the outline of a loaded firearm.

### 1. Compelled Post-Flight Search

The Government's implied consent argument, like its
administrative search claim, ignores the crucial difference
between a pre-boarding screening, voluntarily undertaken, and a
compulsory post-flight search, which was an obligatory
prerequisite before being allowed to leave the airport.  Those
cases finding an implied consent to search emphasize that "a
*pre-boarding* search is not unlawful if there is implied consent,
the search is reasonable, and the prospective airplane boarder
has the right to leave without being subject to search."  *United
States v. Pulido-Baquerizo*, 800 F.2d 899, 901 (9th Cir. 1986)
(emphasis added) (citing *United States v. Davis*, 482 F.2d 893,
912 and n.52 (9th Cir. 1973) ("[P]rospective passengers must
retain the option of avoiding the warrantless *preboarding*
searches by giving up their right to board the aircraft.")
(emphasis added).

---

[15]    It should be noted that for most of the year, the only method of travel
between St. Croix and St. Thomas is by air.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 26

The implied consent theory stresses the importance of choice in voluntarily submitting to a known pre-boarding checkpoint. A prospective passenger who chooses not to submit to screening can simply turn around and leave the airport before the screening begins. Indeed, in *United States v. Davis*, the United States Court of Appeals for the Ninth Circuit noted "that airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft." *Davis*, 482 F.2d at 910-11. *Davis* and other "implied consent" cases draw a sharp distinction between a pre-boarding checkpoint that offers the prospective passenger the right to leave and a compelled search:

> It is significant that the regulations establishing the airport search program do not authorize or require compelled searches.
>
> Such searches would be criminal investigations subject to the warrant and probable cause requirements of the Fourth Amendment.

*Davis*, 482 F.2d at 911.

In this case, Rivera was subjected to a compelled search that gave him no right to leave. The evidence shows that Rivera attempted to walk around the "baggage screening checkpoint" but was stopped and told that "all bags have to be checked." Tr. at 32. That compelled, post-flight search is precisely the type of

search that cannot escape the warrant and probable cause
requirements of the Fourth Amendment.

To be clear, a passenger who takes a nonstop flight between
St. Croix and St. Thomas or vice versa, does not impliedly
consent to a warrantless, suspicionless search upon landing at
his destination.  By electing to fly, a passenger traveling
within the Virgin Islands does not waive the requirements of the
Fourth Amendment that apply to checkpoint searches intended to
detect ordinary criminal wrongdoing.  *Edmonds*, 531 U.S. at 44
("We decline to suspend the usual requirement of individualized
suspicion where the police seek to employ a checkpoint primarily
for the ordinary purpose of investigating crimes.").

## 2. **Voluntary Consent After Initial Unconstitutional Search**

Voluntary consent is another exception to the Fourth
Amendment requirement of both a warrant and probable cause.
Consent to a search is voluntary, if under the totality of the
circumstances it is free from explicit or implicit police
coercion and the product of free will. *Schneckloth v.
Bustamonte*, 412 U.S. 218, 219 (1973).  The Government bears the
burden of demonstrating that consent was voluntarily given and
not the result of duress or coercion.  *Id*. at 249. Whether the
person searched was in custody at the time of his purported

consent is an important factor to be considered in determining voluntariness. *Id.*; *United States v. Watson*, 423 U.S. 411, 424 (1976).

After a Fourth Amendment violation, a subsequent consent to search may, under certain circumstances, remove the taint of the initial illegality, if the consent was voluntarily given and the consent was an independent act of free will. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Brown v. Illinois*, 422 U.S. 590, 601-604 (1975); *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000) ("the admissibility of the evidence challenged as inadmissible under the Fourth Amendment turns on a two-pronged inquiry: 1) whether the consent was voluntarily given; and 2) whether the consent was an independent act of free will.").

There is no question in this case that Rivera did not consent to the initial X-ray scan of his bag after he was stopped at the "baggage screening checkpoint." Even though he attempted to go around the checkpoint, CBP agents told him that all bags had to be checked. Tr. at 32. *Hartwell* suggests that it is not possible to separate this initial X-ray scan from the subsequent physical search of Rivera's bag. They were both part of a single, prolonged search rather than several individual searches. *Hartwell*, 436 F.3d at 178. That would mean that

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 29

Rivera's lack of consent to the initial X-ray scan vitiates consent to the entire search, and the Court's voluntary consent analysis is at an end.

Even assuming, that the initial X-ray scan could be separated from the subsequent physical search, the government has not met its burden of showing 1) that Rivera's consent to the subsequent physical search was voluntarily or 2) that it was an independent act of free will which broke the causal connection between the primary illegality and the proffered evidence.

In *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit outlined a six-part test to be used in deciding whether consent was voluntarily given: "1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found.  No single factor is dispositive." *Jones*, 234 F.3d at 242; s*ee, e.g., United States v. Harvey*, 2006 WL 3513940 at *11-13, 48 V.I. 635, 655-58 (D.V.I. Nov. 29, 2006) (applying *Jones* factors to voluntary consent analysis).

As to the first factor, Rivera was in custody when he was alleged to have consented to the physical search of his bag. Whether a person is in custody depends on whether a reasonable person in the same setting would not have felt free to leave. *Thompson v. Keohane*, 516 U.S. 99 (1995).  The evidence indicates that once the initial X-ray scan revealed the outline of a loaded firearm, Rivera was detained, told to face the wall with his hands up against it, and not free to leave.  Tr. at 37-38, 44.

Second, the actions of the CBP agents were coercive. Rivera was stopped as he was attempting to exit the airport and ordered to place his bag through the X-ray scan.  He was required to undergo a compelled search. The CBP agents admitted, moreover, that Rivera, like the other passengers, was detained even before his bag was physically searched.  Tr. at 37-38.

Third, there is no evidence that Rivera voluntarily cooperated voluntarily with CBP agents or police.  Indeed, Rivera testified that he did not consent to the physical search of his bag, and CBP agent Dasant testified that Rivera attempted to go around the checkpoint to avoid the initial X-ray scan. Tr. at 32, 44.

The record does not allow the Court to evaluate the fourth and fifth factors.  As to the sixth factor, Rivera has

consistently maintained that he was unaware of the presence of a firearm in his bag.  He contends that his bag was left unattended for several hours at the St. Croix airport after he missed his scheduled flight, giving others ready access to it. Defendant's Motion to Dismiss at 1 (filed June 23, 2014). [ECF No. 26].  The CBP agent also testified that under questioning, Rivera claimed that his girlfriend packed his bag. Tr. at 18, 22.

Weighing these factors in light of the available evidence, the Court finds that the Government has not shown by a preponderance of the evidence that Rivera's alleged consent to the physical search of his bag was voluntary.

Even if Rivera's alleged consent were voluntary, the available evidence shows that it was not an independent act of free will.  To determine whether the defendant's consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation, courts consider three factors: "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *Jones*, 234 F.3d at 243; *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 32

First, there was a close temporal proximity between the unlawful detention and X-ray scan and Rivera's alleged consent to the physical search.  Agent Dasant's initial stop of Rivera, the X-ray scan of his bag, and the alleged consent to search were all closely related in time, within the span of several minutes.  Second, the government points to no intervening circumstances that would have attenuated the taint before the initial detention and X-ray scan and Rivera's alleged verbal consent to the search.  Finally, the initial misconduct was flagrant, in the sense that it was done in willful disregard for Rivera's Fourth Amendment rights.  Not only was there no statutory or regulatory authority for the search, it also targeted only passengers arriving from St. Croix, thereby stigmatizing them in the eyes of other arriving passengers who were free to go on their way.[16]

Where there is a close temporal proximity between the initial constitutional violation and the subsequent consent, without any intervening circumstances to attenuate the taint, the Court of Appeals for the Fifth Circuit has generally found that the subsequent consent was not an independent act of free

_____

[16]   The flagrancy of the initial constitutional violation is also discussed in the Court's analysis of the good-faith exception to the exclusionary rule in section III, *infra*.

will. *United States v. Matias*, 658 F.3d 509, 523-25 (5th Cir.
2011) (consent was closely connected to unconstitutional
detention to be independent act of free will); *United States v.
Benavides*, 291 Fed. Appx. 603, 607 (5th Cir. 2008) (consent that
was contemporaneous with illegal detention did not dissipate
taint of illegal seizure); *Hernandez*, 279 F.3d at 309 (although
police action not flagrant, bus passenger's consent to second
search after prior illegal manipulation of her suitcase did not
cure Fourth Amendment violation because of close temporal
proximity and lack of intervening circumstances); *Jones*, 234
F.3d at 243 (although police did not act flagrantly, close
temporal proximity between illegal detention and consent, and
lack of intervening circumstances, did not break causal
connection between illegal detention and consent); *United States
v. Dortch*, 199 F.3d 193, 202 (5th Cir. 1999) (close temporal
proximity, lack of intervening circumstances, and flagrant
police conduct in ignoring defendant's repeated refusal to
consent to search meant causal chain not broken between illegal
detention and consent); *United States v. Chavez-Villareal*, 3
F.3d 124, 128 (5th Cir. 1993) (where only 15 minutes elapsed
between illegal detention and consensual search, no intervening
circumstances occurred, and police acted flagrantly because
where required indicia of individualized suspicion so utterly

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 34

lacking, taint of illegal detention not dissipated and
suppression required).

     For all of these reasons, the Court finds that Rivera did
not voluntarily consent to the search of his bag. Because the
administrative search exception does not apply and because
Rivera did not voluntarily consent, the search of his bag at the
"baggage screening checkpoint" was unreasonable under the Fourth
Amendment.

   **III. Suppression of the Evidence**

     Having found that a search within the meaning of the Fourth
Amendment took place, and having found that search unreasonable,
the Court must now determine whether the evidence should be
excluded from trial.  "Whether to suppress evidence under the
exclusionary rule is a separate question from whether the
Government has violated an individual's Fourth Amendment rights.
. . . Simply because a Fourth Amendment violation occurs does
not mean that exclusion necessarily follows." *United States v.
Katzin*, ___ F.3d ___, 2014 WL 4851779, 2014 U.S. App. LEXIS
19012 *10-11 (3d Cir. Oct. 1, 2014) (*en banc*) (citing *Davis v.
United States*, ___ U.S. ___, 131 S.Ct. 2419, 2426 (2011);
*Herring v. United States*, 555 U.S. 135, 139 (2009) (citations
omitted).  Instead, the exclusionary rule should be applied only
in those "unusual cases" in which it may achieve its objective:

to appreciably deter governmental violations of the Fourth
Amendment. *Katzin*, 2014 U.S. App. LEXIS 19012 at *11 (citing
*United States v. Leon*, 468 U.S. 897, 909, 918 (1984)).
Deterrence must also outweigh the "substantial social costs" of
exclusion. *Leon*, 468 U.S. at 907.

If the good-faith exception to the exclusionary rule
applies, ill-gotten evidence will not be suppressed. *Katzin*,
2014 U.S. App. LEXIS 19012 at *9 (citing *United States v. Leon*,
468 U.S. 897, 920-26 (1984). Where the facts indicate that law
enforcement officers "act[ed] with an objectively 'reasonable
good-faith belief' that their conduct [was] lawful, or when
their conduct involve[d] only simple, 'isolated' negligence,"
there is no illicit conduct to deter. *Katzin*, 2014 U.S. App.
LEXIS 19012 at *12.  "[D]etermining whether the good faith
exception applies requires courts to answer the 'objectively
ascertainable question whether a reasonably well trained officer
would have known that the search was illegal in light of all the
circumstances.'" *Id*. at *13 (citing *Herring*, 555 U.S. at 145).

The good-faith exception requires a court to consider the
legal landscape at the time of the officer's conduct in order to
consider whether that conduct was authorized by law.  In *Davis
v. United States*, the U.S. Supreme Court concluded that
"searches conducted in objectively reasonable reliance on

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 36

binding appellate precedent are not subject to the exclusionary rule." *Davis*, 131 S.Ct. at 2423-24.  In that case, the officer's conduct was specifically authorized by 11th Circuit precedent.  *Id*. at 2429. Application of the good-faith exception turns on whether the agents, at the time they acted, "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987); *Katzin*, 2014 U.S. App. LEXIS 19012 at *40.

Under the circumstances of this case, the Court finds that the CBP agents either knew or should have known that the warrantless, suspicionless, checkpoint search for guns and drugs of passengers arriving on a nonstop domestic flight from St. Croix was unconstitutional.  There are several reasons for this conclusion.  First, the legal landscape in the area of checkpoint searches generally and border searches in particular has been well settled for some time.  *Edmond* clearly established that a checkpoint established for the primary purpose of detecting ordinary criminal wrongdoing, such as the possession of illegal narcotics, was unconstitutional.  531 U.S. at 47-48. Long before *Edmond,* the U.S. Supreme Court invalidated a Puerto Rico statute that authorized the warrantless, suspicionless search of the luggage of passengers arriving from the United

States because there was no border. *Torres v. Puerto Rico*, 442

U.S. 465, 466-67 (1979).

Supervising Agent Dasant, an 18-year veteran of the Customs

and Border Protection agency, testified that he knew that there

was no border between St. Croix and St. Thomas.  Tr. at 37.  He

also should have known that the jurisdiction of CBP agents is

limited to searching for illegal contraband on persons, baggage,

and merchandise at a border or the functional equivalent

thereof.  19 C.F.R. § 162.6.  He also can be charged with

knowledge that CBP agents ordinarily need probable cause to

conduct a search at a point other than the border or its

functional equivalent.  *Almeida-Sanchez v. United States*, 413

U.S. 266 (1973); *see also United States v. Brennan*, 538 F.2d

711, 716 (11th Cir. 1976). In fact, he testified that he knew he

couldn't conduct a search in the interior of St. Thomas.  Tr. at

37.

Moreover, the seasoned CBP agents who conducted the search

in this case should have known that there was no statutory or

regulatory authority for a blanket search of passengers arriving

on a nonstop domestic flight.  In *Katzin*, the U.S. Court of

Appeals for the Third Circuit found that "[g]iven [the] panoply

of authority authorizing [the agents'] actions, we cannot

conclude that a 'reasonably well-trained officer would have

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 38

known that the search was illegal,' nor that the agents acted

with a 'deliberate, reckless, or grossly negligent disregard for

[Appellee's] Fourth Amendment rights. *Katzin*, 2014 U.S. App.

LEXIS 19012 at *41 (quoting *Leon*, 468 U.S. at 922 n. 23; *Davis*,

131 S.Ct. at 2427) (other citations omitted).  The converse is

true here.  The absolute dearth of any statutory, regulatory, or

case law authority to support the warrantless, suspicionless

search of passengers arriving on a nonstop domestic flight

should have at least given the agents pause.

As this Court explained above, no reasonable reading of

*Hartwell* could support an objectively reasonable good faith

belief that the "baggage screening checkpoint" was

constitutional.  The airport checkpoint found permissible in

*Hartwell* is so unlike the "baggage screening checkpoint" in this

case that *Hartwell* actually supports the defendant's motion.[17]  A

reasonably well-trained officer should have known that there are

obvious differences between a pre-boarding screening of all

passengers at a fixed, well-known airport checkpoint and an

impromptu, post-flight search of only passengers arriving from

St. Croix.  Because of those glaring differences, no reasonable

---

[17] *See* discussion in section II, *supra*.

officer would rely on *Hartwell* to justify the search in this case.

Furthermore, the fact that the "baggage screening checkpoint" targeted only passengers arriving from St. Croix should have been cause for alarm and should have caused a reasonably well-trained officer to question the legality of the search. Equal application of the law is such a bedrock principle of law enforcement that a well-trained officer must have known that selective enforcement of the "baggage screening checkpoint" could result in a constitutional violation. *See, e.g., PG Pub Co. v. Aichele*, 705 F.3d 91, 115 (3d Cir. 2013) ("The Equal Protection Clause prohibits the 'selective enforcement' of a law based on an unjustifiable standard.") (citations omitted).

The Fourth Amendment violation in this case was no small trifle. Hundreds of law-abiding citizens were needlessly stigmatized by an unauthorized checkpoint search, which operated on the premise that persons arriving from St. Croix warranted greater suspicion that persons arriving from elsewhere. The search in this case also implicated other rights protected by the Constitution, such as the right to equal protection of the laws and the right to *intra*state travel, which the Third Circuit recognized in *Lutz v. City of York, Pa.*, 899 F.2d 255, 267 (1990).

The basic assumptions undergirding the checkpoint may be even more troubling than the operation of the checkpoint itself: that the Government has power to suspend the Fourth Amendment by erecting an imaginary border between two islands in the same Territory to more easily investigate criminal wrongdoing, all without public debate or even the convenience of a statute. Just as disturbing is the notion that the Government may condition entry into St. Thomas from St. Croix – or into St. John from St. Thomas for that matter – on submission to a compelled search of one's person and effects.  These assumptions are at odds, not merely with the Fourth Amendment alone, but with our very understanding of citizenship in a free society.

"[F]reedom of movement is the very essence of our free society, setting us apart."  *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964) (Douglas, J. concurring).  The Fourth Amendment protects a person's ability to move or travel within the United States without fear of being stopped or detained unless the police have an adequate constitutional justification for doing so.  *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995) (citing *Brinegar v. United States*, 338 U.S. 160, 177 (1949) (The citizen traveling on the highway "who has given no good cause for believing he is engaged in [illegal] activity is entitled to proceed on his way without interference."); *see*

*also Carroll v. United States*, 267 U.S. 132, 154 (1925) (stating that "those lawfully within [the United States], entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official . . . probable cause for believing that their vehicles are carrying contraband.").

If Fourth Amendment jurisprudence stands for nothing else, it stands for the proposition that the Government may not detain a person and prevent her from going about her business without having at least a "minimum level of objective justification for making [a] stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  The guarantees of the Fourth Amendment include "the right of each individual to be [left] alone." *Schneckcloth*, 412 U.S. at 242 (quoting *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966)).

Once Rivera had completed his flight, retrieved his bag, and was heading for the airport exit, CBP agents and local police had no more right to stop and search him, absent reasonable suspicion, than if he were walking along a public street.  In effect, the Government conducted a border search in this case, without the benefit of a border.  No well-trained law enforcement officer could harbor an objectively reasonable good

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 42

faith belief that such a search was constitutional.  The only
reasonable inference from the facts of this case is that law
enforcement agents acted with a "deliberate, reckless, or
grossly negligent disregard for [the defendant's] Fourth
Amendment rights."  *Herring*, 555 U.S. at 144.  Thus, the
deterrent value of exclusion is strong and tends to outweigh the
resulting costs. *Id.*; *accord Chavez-Villareal*, 3 F.3d at 128
("[T]he required indicia of individualized suspicion was so
utterly lacking . . . that only suppression will serve the
deterrent function of the exclusionary rule.").

     Because the warrantless, suspicionless, post-flight search
of arriving passengers in this case was conducted without any
statutory, regulatory, or case law authority; because U.S.
Supreme Court precedents showed, unmistakably, that such a
search was impermissible; because the "baggage screening
checkpoint" unfairly targeted and stigmatized only passengers
arriving from St. Croix; and because there is a real likelihood
that a similar operation may be attempted in the future,[18] the
Court finds that suppression of the evidence is warranted to
deter future violations of the Fourth Amendment.

---

[18]    CBP agents testified that the checkpoint was erected on each island
during its Carnival season, "whenever there's an influx of an introduction of
weapons and narcotics into the territory." Tr. at 10.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 43

## CONCLUSION

This Court is not unaware of the tremendous, negative
impact of random gun violence on life in the Virgin Islands in
general and on Carnival in particular.  Tragically, festivities
meant to celebrate cultural resiliency and vibrancy have, in
recent years, been hijacked by an unscrupulous few who see them
as an opportunity to settle scores at the public's expense. The
problems associated with keeping guns away from the open, public
venues of Carnival are intractable and challenging.  At their
core, they involve balancing the Government's duty to keep the
public safe against the individual's right to be free from
impermissible Government intrusion.

However that balance is struck, the outcome must be
measured, not simply by the needs of law enforcement but by the
limitations that the Constitution places on the Government's
power to act.  The gravity of the threat of gun violence in the
Virgin Islands "cannot be dispositive of questions concerning
what *means* law enforcement officers may employ to pursue a given
purpose."  *Edmonds*, 531 U.S. at 42 (emphasis added).  In Fourth
Amendment jurisprudence especially, the ends (i.e. stopping gun
violence at Carnival) seldom justify the means (erecting a
checkpoint at the airport). Indeed, the primary justification
for the Fourth Amendment's exclusionary rule is "to deter

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 44

unreasonable searches, no matter how probative their fruits."

*Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  That the search in

this case uncovered a loaded firearm in an airline passenger's

baggage does not make it reasonable *per se*, no matter how

fortuitous that discovery may be.

Many of the same considerations that led law enforcement to

create a "baggage screening checkpoint" in this case prompted

Puerto Rico to act in a similar fashion almost forty years ago.

Faced with "a serious increase in the importation of firearms,

explosives, and narcotics . . . and a concomitant increase in

crime on the island," Puerto Rico passed a law in 1975 that

allowed its officers to search the luggage of any person

arriving from the mainland United States.[19]  *Torres v.*

*Commonwealth of Puerto Rico,* 442 U.S. 465, 466-67 (1979).  Like

the baggage screening checkpoint here, the Puerto Rico law did

not require probable cause to search, and it gave the police

discretion to search some passengers but not others.[20]  *Id.*

---

[19]    The law allowed the police to search the "luggage, packages, bundles,
and bags of passengers and crew who land in the airports and piers of Puerto
Rico arriving from the United States."  Public Law 22 § 1, P.R. Laws Ann,
Tit. 25, § 1051 (Supp. 1977).

[20]    Pursuant to that law, the police searched the luggage of the defendant
in *Torres* after he arrived on a nonstop flight from Miami.  That search
uncovered marijuana, a wooden pipe bearing marijuana residue, and $250,000 in
cash. *Torres*, 442 U.S. at 467.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 45

Puerto Rico claimed that its crime control problems were so grave that it was necessary to create an "intermediate border" between it and the United States so that all persons entering its territory could be searched without a warrant or probable cause.[21]   In effect, Puerto Rico argued that it needed a special exception to the Fourth Amendment because of its unique political status and because of the fact that its borders, as an island, are in fact international borders with every country except the United States.   *Torres*, 442 U.S. at 472.   It also analogized the search of arriving passengers to searches that fall within the administrative search exception, such as the use of metal detectors at airports, and state inspection of goods pursuant to health and safety regulations.   *Id*.

The U.S. Supreme Court rejected each of Puerto Rico's claims.   It held that the search of the arriving passenger's luggage without probable cause or a warrant violated the Fourth Amendment, and it suppressed the evidence obtained from the unlawful search.   *Torres*, 442 U.S. at 474.   The reasoning in

---

[21]   Just as there is no border between St. Croix and St. Thomas, there is no border between Puerto Rico and the United States, since they are part of the same customs zone.   *See* 19 C.F.R. § 162.6 ("Customs territory of the United States . . . includes the States, the District of Columbia, and Puerto Rico."); Harmonized Tariff Schedule of the United States, General Note 2, 19 U.S.C. § 1202 (same)(available at http://www.usitc.gov/publications/docs/tata/hts/bychapter/1401gn.pdf#page=3).

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 46

*Torres* is directly relevant to the concerns of law enforcement

in this case, forty years later:

>        Puerto Rico urges that because of the
> seriousness of the problems created by an
> influx of weapons and narcotics, it should
> have the same freedom to search persons
> crossing its "intermediate border" as does the
> United States with respect to incoming
> international travelers.
>
>       . . .
>
>        Puerto Rico's position boils down to a
> contention that its law enforcement problems
> are so pressing that it should be granted an
> exemption from the usual requirements of the
> Fourth Amendment.  Although we have recognized
> exceptions to the warrant requirement when
> specific circumstances render compliance
> impracticable, we have not dispensed with the
> fundamental Fourth Amendment prohibition
> against unreasonable searches and seizures
> simply because of a generalized urgency of law
> enforcement.

*Id*. at 473-74.

In this case the purpose for the checkpoint was clear.

When asked what the purpose for the search, agent Etienne

testified:

>        Q.   And you said the purpose of this
> search was for what?
>
>        A.   We were doing an operation for
> Carnival.
>
>        Q.   Carnival.  Operation for Carnival?
>
>        A.   Yes.

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 47

       Q.   Customs is involved in some
operations for Carnival?  U.S. Customs?

       A.   It was a joint operation we were
assisting.

Tr. at 22-23.  On direct examination, CBP supervising agent

Ralph Dasant corroborated agent Etienne's testimony regarding

the purpose of the checkpoint:

       Q.   What were you doing that day
[April 29, 2014]?

       A.   I was part of a federal task
force.

       Q.   And what was that federal task
force about?

       A.   It was in reference to the
Carnival.  There was a meeting and we were
tasked with supporting that task force with
inspecting aircrafts.

       Q.   And you said during the Carnival.
It was specifically for that particular time
period?

       A.   Yes, it was.

       Q.   Okay, do you guys do this any
other time?

       A.   We do it for the St. John Carnival
also.  And I think it's just the St. John
Carnival and the St. Thomas Carnival.

       Q.   Okay, and why were you doing it
for Carnival?  Do you know?

       A.   Yes.  *Because of the influx – the
mass influx of people, movement of weapons
and drugs coming between the islands.*

*United States v. Rivera*
Criminal No. 2014-31
Memorandum Opinion
Page 48

       Q.   Okay.  So this was set up for that particular reason?

       A.   That is correct.

*Id.* at 27-28 (emphasis added).

The Government's interest in addressing the threat of gun violence during Carnival in St. Thomas is, to be sure, a very compelling one, but it has little to do with "preventing terrorist attacks on airplanes."  *Hartwell*, 436 F.3d at 180. Because the primary purpose of the "baggage screening checkpoint" was, in the end, to advance the general interest in crime control, the search of Rivera's bag required a warrant or individualized suspicion.

In sum, whatever the outer boundaries of the Fourth Amendment, they do not encompass a warrantless, suspicionless search for guns and drugs at a one-day airport checkpoint that targeted only passengers arriving from St. Croix.  No court has ever applied the administrative search exception to a post-flight search of a domestic passenger's luggage, and this Court declines the Government's invitation to be the first.  An appropriate order follows.